300 Ga. 750
FINAL COPY



S16A1439.  HORNBUCKLE v. THE STATE.


BOGGS, Justice.

Appellant Carol Sue Hornbuckle was convicted of murder in connection

with a domestic dispute that ended in the stabbing death of Charles Keith

Raburn.[1] The trial court denied Hornbuckle's amended motion for new trial, and

she appeals, asserting error in denying her motion for immunity under OCGA

§ 16-3-24.2, errors in the trial court's charge to the jury, and ineffective

assistance of trial counsel. For the reasons that follow, we affirm.

Viewed in the light most favorable to the jury's verdict, the evidence

presented at trial showed that Hornbuckle moved in with the victim shortly after

---

[1] The crime occurred on August 11, 2007. On November 19, 2007, a Tift County grand jury indicted Hornbuckle on charges of malice murder, felony murder predicated on aggravated assault, and aggravated assault. Hornbuckle was tried before a jury September 21-24, 2009, and found guilty on all counts. She was sentenced to life in prison for murder; the remaining convictions were vacated by operation of law or merged. See Malcolm v. State, 263 Ga. 369, 372 (5) (434 SE2d 479) (1993). Hornbuckle's motion for new trial was filed by trial counsel on September 30, 2009, amended by new counsel on January 25, 2011, and amended by a third counsel on December 20, 2013 and October 16, 2014. The motion for new trial was denied on October 28, 2014. Hornbuckle's notice of appeal was filed on October 31, 2014, and the case was docketed in this Court for the September 2016 term and submitted for decision on the briefs.

they met. The relationship became violent, with many incidents of physical confrontations fueled by alcohol. In two of those incidents, Hornbuckle was the aggressor. On July 7, 2007, a verbal argument turned physical when Hornbuckle struck the victim in the face with a glass, causing visible injuries. She gave conflicting stories to the police and had no visible injuries despite her claim that the victim hit her. Deputies arrested her on a charge of family violence battery. According to an officer, she was drunk and "irate and angry." She was released on bond with the conditions that she "[s]tay away, absolutely, directly or indirectly, by person, mail, telephone or third person, from the person, home and work place of [the victim]," and that she "do no harm or threat of violence to [the victim] or any member of his family."

During the week before the victim's death, he received two telephone calls at work in the presence of his supervisor. At the time of the first call, the supervisor could not make out the words but could hear that the caller was speaking in an "aggressive-type tone." When the victim hung up the phone he turned to his supervisor and said, "She threatened to kill me." A few days later, on a Thursday, the victim received another call, and the supervisor testified that he overheard and could tell that the victim "was trying to calm the situation

2

down." The victim remarked to the supervisor that he "can't put up with this anymore, he's tired of the threats and stuff like that." Asked on cross-examination how he knew it was Hornbuckle and not one of the victim's ex-wives, the supervisor stated that the victim told him that he was going to take out "a restraining order . . . against Carol." The supervisor testified that he and the victim "had kind of opened up" despite his practice of not talking about personal affairs at work, and they had "extensive" conversations regarding their personal situations and family problems.

The following Saturday, Hornbuckle went to the victim's home, in violation of her bond conditions. An argument developed during the evening and continued after she woke the victim up to ask him to come to bed. Hornbuckle testified that the victim began hitting her and told her to "get in [her] truck and leave." She testified that she went into the bathroom, and he followed her, knocking her off the toilet with a blow to the head. When she went into the living room and attempted to leave, he blocked the door, and when she sat down on a chaise lounge, he hit her and knocked her to the floor. At that point, Hornbuckle crawled into the kitchen and grabbed a large knife; the victim did not follow her, but remained in the living room. She testified that she wanted

to leave the house, but instead of leaving from the kitchen via the back door she returned to the living room. While she implied that she could not leave through the back door because the back yard had a tall fence and a locked gate, police found the gate open and in fact escorted Hornbuckle from the residence through the gate. A deputy who responded to the incident in July observed that the gate also was open at that time.

Hornbuckle testified that when she returned to the living room, the victim attacked her, and there was "a struggle" and they were "spinning or turning" between the chaise lounge, a cabinet, and the front door. However, the furniture was not in disarray, and small objects on the cabinet were not disturbed. Hornbuckle testified that the next thing she remembered was falling to the ground with the victim on top of her, and then she noticed that he was bleeding "a stream of blood." The knife had passed completely through the victim's heart and into one lung, killing him. Hornbuckle insisted that she did not intend to stab the victim and held the knife at her side throughout the encounter, but the medical examiner testified that the victim had an abrasion on his neck, a defensive wound on his wrist, and two relatively superficial puncture wounds on his chest in addition to the fatal wound. And while Hornbuckle testified that

4

the victim fell on top of her, a deputy and a paramedic testified that the victim was lying in an "enormous amount of blood" but Hornbuckle had only blood "spatter" on the side and back of her shirt. Despite testifying that she had been struck in the head and face, Hornbuckle had no injuries except bruises on her right arm, which she acknowledged could have been a "possible" injury from the victim attempting to block a knife, although she added that was "not what happened."

In the recording of Hornbuckle's call to 911, which was stipulated to by the parties and played for the jury, Hornbuckle told the dispatcher, "I'm tired of him smacking me, I'm fed up with it, and I've hurt him, okay?" and "I can't let him keep on smacking me around." She added, "I did stab him."

1. Hornbuckle has not raised the sufficiency of the evidence. Nevertheless, we have independently reviewed the record with an eye toward the legal sufficiency of the evidence. We conclude that the evidence adduced at trial was legally sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Hornbuckle was guilty of malice murder. See Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. Hornbuckle asserts that the trial court erred in denying her motion for

immunity under OCGA § 16-3-24.2, because she was reasonably defending herself against the victim. To avoid trial based on a justification defense presented at an immunity hearing, "a defendant bears the burden of showing that he is entitled to immunity under OCGA § 16-3-24.2 by a preponderance of the evidence." Bunn v. State, 284 Ga. 410, 413 (3) (667 SE2d 605) (2008). "In reviewing the denial of a motion for pretrial immunity, we must view the evidence in the light most favorable to the trial court's ruling and accept the trial court's findings of fact and credibility determinations if there is any evidence to support them. [Cit.]" Sifuentes v. State, 293 Ga. 441, 444 (2) (746 SE2d 127) (2013).

At the hearing on her motion for immunity, Hornbuckle testified similarly to her testimony at trial. She testified to numerous prior altercations, claiming that the victim was the aggressor, but she did not seek medical attention and had no proof of any injuries from these conflicts. She acknowledged that she went to the victim's house on the night of the incident in violation of a court order. She testified that she and the victim argued, and he hit her in the bedroom, the bathroom, and the living room, then prevented her from leaving the house. She had no visible injuries from these blows, however. After the victim hit her again,

6

she went to the kitchen and got a knife, then returned to the living room, where the victim grabbed her and "slung [her] around." They ended up on the floor, she saw that he was bleeding, and she called 911. Hornbuckle acknowledged that she did not know why she did not leave through the back door instead of returning to the living room, even though the gate was open; "[i]t didn't even enter [her] mind." And she acknowledged that she had her cell phone with her at all times but did not call for help until after the victim was stabbed. In addition, the 911 recording was heard by the trial court.

This evidence was sufficient to support the trial court's denial of Hornbuckle's motion for immunity. Hornbuckle's testimony that the victim attacked her, that she had no means of escape, and that she had reason to believe he would harm or kill her was not uncontroverted, as the physical evidence and Hornbuckle's statements in the 911 call and on cross-examination provided some evidence that the encounter did not occur in the manner she described, that the victim did not attack her as she claimed, that she did not attempt to escape or call for help but instead precipitated the fatal encounter, and that the victim did not fall on the knife but was stabbed repeatedly while trying to defend himself. This evidence authorized the trial court to conclude that Hornbuckle's actions were

7

motivated by aggression or anger rather than self-defense. See, e.g., Sifuentes, supra, 293 Ga. at 444-445 (2).

Hornbuckle also contends that the trial court erred as a matter of law because it ruled that defenses of self-defense and accident were mutually exclusive. But the trial court did not make such a ruling; it simply denied the motion for immunity without further comment. The State's assertion that Hornbuckle was raising a legal defense of accident was vigorously contested by Hornbuckle's counsel. And, in the subsequent hearing on third party acts of violence, the trial court definitively rejected the State's argument that Hornbuckle's testimony foreclosed a defense on justification as "mutually exclusive defenses." In the absence of any explicit ruling by the trial court we cannot assume that it improperly applied the law in the manner posited by Hornbuckle. "The appellant bears the burden of proving error by the appellate record." King v. State, 300 Ga. 180, 182 (2) (794 SE2d 110) (2) (2016).

3. Hornbuckle complains that the trial court erred in instructing the jury on revenge, contending that it was not an accurate statement of the law as set out in Rector v. State, 285 Ga. 714 (681 SE2d 157) (2009), and that it was not adjusted to the evidence. The trial court gave almost verbatim the relevant pattern charge

from the Georgia Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.16.30, Revenge for Prior Wrong,[2] and the pattern instruction is an accurate statement of the law. See Rector, supra, citing Hill v. State, 250 Ga. App. 9, 11-12 (1) (550 SE2d 422) (2001). Hornbuckle contends that "no evidence was introduced to prove Hornbuckle 'deliberately sought out Raburn to avenge a past wrong,'" but "[t]o authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge. [Cit.]" Hicks v. State, 287 Ga. 260, 262 (695 SE2d 195) (2010). Here, as noted above, some evidence was

---

[2] The trial court charged the jury:

I further charge you, Ladies and Gentlemen, that a person has the right to defend [herself] but a person is not justified in deliberately assaulting another person not to prevent any impending wrong but solely in revenge for a past or previous wrong regardless of how serious the past or previous wrong might have been when the episode involving that previous wrong has ended. Such person is not justified in acting out of revenge by deliberately seeking out and assaulting the alleged wrongdoer. If you find from the evidence that Ms. Hornbuckle used force against Mr. Raburn in order to prevent an impending wrong that Ms. Hornbuckle reasonably believed was about to be committed by Mr. Raburn and that Ms. Hornbuckle reasonably believed that such force was necessary in order to prevent impending death or great bodily injury to herself or to prevent the commission of a forcible felony, then that use of force would be justified and it would be your duty to acquit Ms. Hornbuckle in this case.

On the other hand, if you believe beyond a reasonable doubt from the evidence that Ms. Hornbuckle used force against Mr. Raburn in the manner alleged in the indictment for the sole purpose of avenging a past or previous wrong regardless of how serious such previous wrong may have been and not for the purpose of preventing impending death or great bodily injury to herself or to prevent the commission of a forcible felony, then you would be authorized to convict Ms. Hornbuckle in this case.

9

presented that Hornbuckle acted out of anger or vengefulness at past wrongs rather than from a reasonable apprehension of harm from the victim. See Teems v. State, 256 Ga. 675, 676-677 (3) (352 SE2d 779) (1987) (evidence that murder victim beat and pistol-whipped appellant on previous occasion authorized charge on revenge).

4. Hornbuckle next asserts that the trial court erred in failing to give definitions and elements of the underlying crimes relevant to her claim of justification and a definition of the term "forcible felony." But because she neither requested the instruction nor objected to its omission, we review this enumeration solely for plain error under OCGA § 17-8-58 (b). Sanders v. State, 290 Ga. 637, 640 (2) (723 SE2d 436) (2012). This standard requires that we determine

> whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings. If all three of these questions are answered in the affirmative, the appellate court has the discretion to reverse if the error seriously affects the fairness, integrity, or public reputation of the proceedings below. Satisfying all four prongs of this standard is difficult, as it should be.

(Citations and punctuation omitted.) State v. Kelly, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011). The trial court gave a thorough and complete charge on justification, including instructions on the definition of affirmative defense, the

10

State's burden of proof, family violence, reasonable belief of imminent danger, and battered person syndrome, as well as accident. Hornbuckle cannot successfully demonstrate that including a further definition of family violence or definitions of forcible felony or assault would have affected the outcome of the proceedings, and therefore has failed to show plain error.

5. Hornbuckle contends that the trial court erred in failing to consider the general grounds under OCGA §§ 5-5-20 and 5-5-21 in her motion for new trial.

> Even when the evidence is legally sufficient to sustain a conviction, a trial judge may grant a new trial if the verdict of the jury is "contrary to the principles of justice and equity," OCGA § 5-5-20, or if the verdict is "decidedly and strongly against the weight of the evidence." OCGA § 5-5-21. *When properly raised* in a timely motion, these grounds for a new trial — commonly known as the "general grounds" — require the trial judge to exercise a "broad discretion to sit as a 'thirteenth juror.'" In exercising that discretion, the trial judge must consider some of the things that [he] cannot when assessing the legal sufficiency of the evidence, including any conflicts in the evidence, the credibility of witnesses, and the weight of the evidence.

(Citations and punctuation omitted; emphasis supplied.) White v. State, 293 Ga. 523, 524 (2) (753 SE2d 115) (2013). Moreover, "[a] party may not complain on appeal of a ruling that he contributed to or acquiesced in by his own action, trial strategy, or conduct." (Citation omitted.) Holcomb v. State, 268 Ga. 100, 103 (2) (485 SE2d 192) (1997).

11

Here, Hornbuckle's trial counsel filed a motion for new trial asserting that "the verdict . . . was against the weight and sufficiency of the evidence." New counsel thereafter filed an "Amended Motion for a New Trial" explicitly asserting both that "the verdict and sentence are decidedly and strongly against the weight of the evidence" and that "the verdict and sentence are contrary to law and the principles of justice and equit[y]." Yet another attorney filed a "Second Amended Motion for New Trial," however, which did not amend the first motion or incorporate it by reference, and asserted only the sufficiency of the evidence and ineffective assistance of counsel. In the brief in support of this motion, counsel cited OCGA §§ 5-5-20 and 5-5-21, but only as an alternative argument not enumerated in his argument on the sufficiency grounds. Moreover, at the hearing, the trial court specifically inquired if counsel was "[w]orking off your second amended motion for new trial," and counsel responded, "That is correct."[3] While Hornbuckle's counsel arguably raised the general grounds in his brief, even if only as an alternative in his argument on sufficiency, "[a] brief normally does not amend a motion for new trial to add new grounds. [Cit.]" Cowart v.

---

[3] After the hearing, counsel filed a "Third Amended Motion for New Trial" which elaborated on the ineffectiveness claims, but again failed to raise the general grounds.

State, 294 Ga. 333, 338 (3) (751 SE2d 399) (2013). Moreover, counsel responded to the trial court's question by affirming that he was proceeding on the second amended motion for new trial, which made no mention of the general grounds. And while he again mentioned the "thirteenth juror" at the hearing, it was in the context of his argument on counsel's ineffectiveness in examining an expert witness, and he conflated the general grounds and sufficiency in his argument. The trial court's order denying Hornbuckle's motion for new trial duly addressed the grounds enumerated in the second motion for new trial and elaborated on in the third motion. Hornbuckle abandoned the general grounds by failing to include them in the motion for new trial which counsel expressly assured the trial court he was relying upon. See Slaton v. State, 296 Ga. 122, 125 (2) (765 SE2d 332) (2014) (counsel informed trial court he was asking for new trial based on arguments at hearing and failed to argue general grounds); compare Walker v. State, 292 Ga. 262, 264-265 (2) (737 SE2d 311) (2013) (trial court failed to apply proper standard of review when appellant explicitly asserted grounds under OCGA §§ 5-5-20 and 5-5-21 in amended motion for new trial).

6. Finally, Hornbuckle claims that her trial counsel was ineffective in calling the victim's third ex-wife as a witness at trial, in failing to object to the

testimony of the victim's supervisor, and in failing to question an expert witness regarding whether Hornbuckle's actions were reasonable.

To prevail on a claim of ineffective assistance, Hornbuckle must prove both that the performance of her lawyer was deficient and that she was prejudiced by this deficient performance. Strickland v. Washington, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). To prove that the performance of her lawyer was deficient, Hornbuckle must show that the lawyer performed her duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. Id. at 687-688 (III) (A). See also Kimmelman v. Morrison, 477 U. S. 365, 381 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). And to prove that she was prejudiced by the performance of her lawyer, Hornbuckle must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, supra, 466 U. S. at 694 (III) (B). See also Williams v. Taylor, 529 U. S. 362, 391 (III) (120 SCt 1495, 146 LE2d 389) (2000). This burden is a heavy one, see Kimmelman, supra, 477 U. S. at 382 (II) (C), and Hornbuckle has failed to meet it.

14

(a) Hornbuckle complains that trial counsel was ineffective in calling the third ex-wife of the victim to testify to various acts of violence against her, because counsel knew that the witness had negative feelings toward Hornbuckle and blamed Hornbuckle for the breakup of her marriage. But trial counsel explained at the hearing on the motion for new trial that she believed that it was important to have the third ex-wife testify despite her animosity toward Hornbuckle, because the victim committed more acts of violence against the third ex-wife than both of the other ex-wives combined. Counsel had also anticipated that this witness might lie and would try to minimize the violent acts and had prepared to impeach her if necessary based on court documents. Trial counsel agreed that it was a strategic decision to run the risk of having the witness disparage Hornbuckle in order to get all the acts of violence by the victim against all his ex-wives before the jury.

"A decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." Shockley v. State, 297 Ga. 661, 666 (3) (777 SE2d 245) (2015). Here, trial counsel offered a "considered, informed, and

reasonable" explanation for the decision to call the witness, and "this Court cannot say that this decision was outside the range of reasonable professional assistance." Id.

(b) Hornbuckle next asserts that trial counsel was ineffective in failing to object to the testimony of the victim's supervisor regarding threats made to the victim. We first note that trial counsel was never questioned about this decision at the hearing on the motion for new trial, and "without testimony from trial counsel on the reasons for his actions, trial counsel's decisions are presumed to be strategic and thus [generally] insufficient to support an ineffective assistance of counsel claim." (Citations and punctuation omitted.) Bright v. State, 292 Ga. 273, 275 (2) (a) (736 SE2d 380) (2013). Moreover, the supervisor's testimony was admissible under the necessity exception to the hearsay rule. Under Georgia's former Evidence Code, "[f]or a statement to be admissible under the necessity exception to the rule against hearsay, its proponent must show a necessity for the evidence, a circumstantial guaranty of the statement's trustworthiness, and that the hearsay statements are more probative and revealing than other available evidence." (Citation and punctuation omitted.) Davis v. State, 294 Ga. 486, 487 (2) (754 SE2d 67) (2014); see former OCGA § 24-3-1

16

(b). The first part of the test was satisfied because the victim was clearly unavailable as he had been killed by Hornbuckle. Williams v. State, 299 Ga. 209, 212 (2) (787 SE2d 187) (2016). The second part of the test was satisfied by the supervisor's testimony that he and the victim had "opened up" to one another and had "extensive" conversations about personal matters, and the supervisor had no apparent motive to be untruthful in his report of the victim's spontaneous statement contemporaneous with the phone call that precipitated it. Id. at 212-213 (2); McNaughton v. State, 290 Ga. 894, 899 (3) (b) (725 SE2d 590) (2012). Finally, the evidence was probative and revealing of Hornbuckle's relationship with the victim and her state of mind shortly before his death. Id. at 898 (3) (b). "[Trial] counsel's failure to make a meritless objection cannot constitute evidence of ineffective assistance. [Cits.]" Porter v. State, 292 Ga. 292, 294 (3) (a) (736 SE2d 409) (2013).

(c) Lastly, Hornbuckle asserts that trial counsel was ineffective in failing to question her expert witness, a licensed clinical social worker, to elicit specific testimony that her actions were reasonable on the night of the incident. Pretermitting whether counsel's performance was deficient, Hornbuckle has failed to show prejudice. At trial, the witness testified at length, using visual aids,

17

regarding sufferers from post-traumatic stress disorder and battered person's syndrome. She then detailed her evaluation of Hornbuckle and her conclusions based on that evaluation, including her diagnosis that Hornbuckle suffered from both conditions. She explained Hornbuckle's conduct as "terror" and "panic" caused by her conditions and her prior attacks on the victim as "reactive behavior" by a battered woman. Trial counsel used the witness's testimony to argue repeatedly in closing that Hornbuckle's actions were reasonable in light of her condition. And the trial court's lengthy instructions on justification included repeated references to reasonable belief and instructed the jury that the expert witness's evidence was admissible "for the limited purpose of illustrating that Ms. Hornbuckle had a reasonable belief in the imminence of additional physical abuse at the hands of the victim and that, therefore, she was presently justified in acting in self-defense." Hornbuckle therefore has failed to show a reasonable probability that the outcome of the trial would have been different had trial counsel directly asked the question of whether Hornbuckle's conduct was reasonable.

Judgment affirmed. All the Justices concur, except Melton, P. J., who concurs in judgment only in Division 5.

Decided  February 27, 2017 – Reconsideration denied March 20, 2017.

Murder. Tift Superior Court. Before Judge Reinhardt.

Matthew K. Winchester, for appellant.

C. Paul Bowden, District Attorney; Sam S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.